Good morning. Good morning. Thank you. May it please the Court, Joshua Thompson on behalf of Plaintiffs Azadeh Khatibi and Dunal Harm. This case, Azadeh Khatibi creates CMEs. She's a renowned ophthalmologist. She has been for years. She researches the CMEs. She creates the content. She delivers them. At no time during the CME creation is the State of California involved. And no time is the Medical Board of California involved. This is Dr. Hold on. One minute. Yeah. So her courses comply with all of the CME requirements? The courses that she has submitted, that she has performed, complied with all the CME requirements. Of course, she has not complied with the CME requirement that we are challenging, the implicit bias mandate. She has chosen not to be compelled to speak contrary to her views. But up until that point when she was giving CMEs, of course, yes, they all complied with all of the CME requirements. And she can put together courses and teach in whatever manner she likes. It's really the accreditation, the credit that's the issue here? It's not the credit that's the issue. The State of California offshoots the accreditation to private organizations, be it the American Medical Association or be it university, Stanford University. What is that issue? My question is, is there anything that prevents her from creating her own classes and teaching them? I think your honors question goes to whether this is, in fact, compelled speech, not whether, in fact, this is government speech. No. Of course, she can go on the street corner and start talking about what she is an expert in. She can give that speech. She is not prohibited from speaking in that regard. But that doesn't make it government speech. That's the only— No, but I think the question really goes to, she can still prepare and teach a continuing medical education classes if anybody will come when it's not sanctioned by the State Board, right? She can still go ahead and do that. She can give a—she can stand up and give a continuing medical education course. It could even be credited by an American Medical Association. The only thing that—the only exertion that the State of California puts on is if they, in fact, choose to audit it later and it doesn't include this implicit bias component, it could arguably not receive credit at that point. Well, it's not arguably, though, right? It's not arguably. If it's not including that, it would not get credit, correct? That's right. Okay, so let's stop there for a second. Then if the State of California then is able to control what is and or is not able to get credit, then isn't that government speech? Of course not. The speech at issue is how to perform ocular tumor surgery, how to give appendectomies, or how to perform appendectomies. That is the speech. Whether it is credit or not has nothing to do with the speech that is provided. You may be saying it's not compelled because, as Judge Wynn was noting, she can still talk about these things and maybe it's not compelled, and those issues will certainly be raised down below, whether this is compelled speech, whether it is viewpoint neutral, whether it is content-based, whether it meets the tailoring that is required. But none of that— Because on the one hand, she can create whatever classes she wants. She can teach whatever classes she wants, wherever she wants. But it's only when she is seeking credit that she has to comply with all of these requirements that the state has set forth, right? So it's relevant to whether that's government speech in the context of speaking and complying with the statutory requirements. What this may go towards, what this control—it may go to the extent of government control over the speech, the third factor in TAM, in SUNM, in Walker, whether the government exerts enough control over the speech to transform what is, I think everybody would concede, up until the point the government gives its stamp of approval, private speech, she created it, she spoke it. Does the stamp of approval that gives it credit transform it into what is purely private speech into public speech? And I don't think TAM or Walker—TAM, which of course dealt with trademarks, extensive government control over the regulation of trademarks. There was a stamp of approval. There was editing going on. The Supreme Court said, no, that's not enough control to transform what is purely private speech into government speech. What was different in Walker, Walker where the Supreme Court did find there was significant control, was that there was editorial control. The Department of Motor Vehicles of Texas could go in and say, no, we don't want you to say this. We want you to say that. We're not going to approve this. We're going to approve that. None of that editorial control is here. California doesn't even know what she's saying. They may not ever edit it. They may not ever audit it. I'm sorry. But here's the point, though. When and if they do, they can control it, though. Isn't that the point? They cannot control the speech. They can give it credit. But that doesn't change the speech. The speech would still be there. The speech happened. Her speech existed. It's out there in the world. Whether it gets credit or not— So you're saying that every single requirement that would lead to accreditation is compelled speech? Of course not. There are certain regulatory requirements that are not speech that people have to— The requirement is cultural competency. She has to teach about cultural competency. Is that compelled speech? That may be compelled, but it's not being challenged here whether or not that's— It's certainly not government speech. It would still be her speech that she created. It may not be compelled, and, Your Honor, I want to reiterate that. We're not here on whether this is compelled speech. All of those issues, those really thorny issues of whether this is compelled speech, whether this is viewpoint-based, whether it is content-based, whether she's compelled to say these things, the very bare bones of what a compelled speech claims, none of that is before this court today. The only thing that is before this court is whether her words that she created, she came up with, she delivered, she imagined, she researched, whether those are government speech, and, of course, they're not. We have all attended CLEs. Maybe Your Honors have given CLEs. Those are things that you have thought up, that I, as a lawyer, I have given CLEs. I certainly don't think the California State Bar thinks when I, as a Pacific Legal Foundation attorney, is speaking at a CLE that I'm speaking on behalf of the state, that that is government speech. It is not. It is purely private speech that we create as creators, as speakers, and the fact that it gets credit or doesn't get credit doesn't transform it into government. That is precisely what Tam talked about when I talked about a stamp of approval after the fact. If a stamp of approval is sufficient to transform what is purely private speech into government speech, that has drastic consequences. I'm sorry, but Walker, Schertfeld, Mattel, all of these cases seem to suggest to us that it's the level of control, and what you're saying, and I'm trying to make sure I understand your argument. Your argument is that all we're talking about here is that they're giving credit versus they're not telling the doctor what to say specifically, and, therefore, it's not government speech. But if they can control what she says in line of giving the specific credit, then aren't they, in fact, isn't that exactly government speech? Your Honor, I don't understand the line you could draw from Tam. The government in Tam was saying we can say yes or no to this trademark. The government in Shurtleff was saying we can say yes or no to this flag, whether it gets raised. That is the seal of approval. That is what is not sufficient. What has to be sufficient for control is not after the fact stamps of approval. The Supreme Court is crystal clear on that fact. What they mean by extent of control, the third Tam factor, the third Walker factor, is editorial control. Are you exerting editorial control over the content of the message? They repeat that over and over. It's the message that you have to show control over. And at no time here has California exerted any control over the message. At most, they are aware, they're not even aware of the message sometimes. You could give CMEs, and, in fact, the allegations in the complaint are Dr. Katibi's CMEs have never been audited. That means that California has no idea what is being said. How can the government know? How can it be the- Well, she can't say just whatever. She has to say, for example, like she has to teach something about opioid addiction, geriatric care, cultural competence, implicit bias. And so the statute lays out quite a few topics that have to get covered before credit is given, right? That's not right, Your Honor. She does not have to speak about opiate care. She does not have to speak about geriatric care. Those are standalone courses that she can choose or not choose whether to teach or not. She is not being compelled to speak those things. That is different. When she gives a CME on, say, ocular tumors, she is being compelled to include in that discussion implicit bias. That is the compulsion. That is changing- Can she include implicit bias but then say, I don't agree with any of it? I don't think that's even a thing. I think what Your Honor is asking is- Does that prevent her from saying that? Nothing is preventing her from saying that, which just underscores why this isn't government speech. Now, maybe it's not compelled speech. But if she can say that, then how could it be government speech? If she can get up there and say, I don't agree with any of this. This is all nonsense. That's the government speech and that's what the state of California thinks is being said? I don't think so. What is government speech is when the government is speaking. That's what the government speech doctrine exists to do. It's to allow the government to speak when it has something to say. The government isn't co-opting the things that doctors say 3,000 or so CMEs that are available for credit by the American Medical Association. This is just- Well, that's why we're asking a lot of questions about the extent of the government control because we're trying to figure out, even though she's a private individual, whether that's enough to constitute government speech. I understand why you're asking the extent of the government control, Your Honor. What I'm trying to explain is the extent of the control is nonexistent over the message that she's delivering. It's after-the-fact regulatory control that is run-of-the-mill regulation, but nothing. I don't even think California would get up here. Maybe I'm wrong, and they will say that when doctors are talking about things that the state of California knows nothing about, that that is all of a sudden government speech. It doesn't make sense. Do you agree that some of the other factors, and I'm thinking right now of sort of the history of expression, that this is something where there's been historical control and regulation by the government in terms of licensing? Don't you think that that's a factor that weighs against your position? I don't think so, Your Honor. I think the history of government expression here weighs strongly in our favor, and I would caution the court not to view it as history of government control over the message. That's conflating the first factor and the second-third factor. Government regulation over medical licenses is what I mean. Yeah, the standard, the first factor, is the history of the government's control over the message, the history of the government using that forum as a message body, history of the government in the message. There is no history of the government speaking through CMEs. There is certainly a history of the government regulating continuing medical education courses, much like there is a history of the government regulating patents. There is a history of the government regulating licenses. There is certainly a history of the government putting up flags on flagpoles. But what's different about those cases is that in our case, there is no history of the government delivering a message through CMEs. Well, I'm looking at 2190.1 that sets forth numerous components, numerous standards that educational activities must meet. Yes, Your Honor. That's a control, right? We look to the standards set by the state in determining whether the government has exerted control. That is, with respect, Your Honor, that are the guardrails in which the government sets the speech can happen. It's essentially the forum. If you comply with these things, you can say whatever you want. But it's still the private speaker who is speaking. It's certainly provided certain things. So you can say whatever you want so long as it relates to these requirements that are set, the standards that are set within the statute. Right. And you can imagine 10,000 different things that you can say that fall within those standards. Those 10,000 different things may be contradictory. They may go against each other. They may be — And what's different about implicit bias? She can say 10,000 different things about implicit bias. If that's the standard, she can say whatever she wants within those guidelines under your argument. Again, Your Honor, that would be a great defense on the compelled speech claim. But that doesn't make it government speech. I don't understand how the fact that 10,000 contradictory different things can be said make it government speech. It may be that it's not compelled. It may be that the government has a compelling interest in it. It may be that it's not viewpoint or content-based. But none of those issues are before the court today. The only issue is whether it is government speech. If you're saying, Your Honor, that the speaker, the physician, can give contradictory views, and both of those are the government speech, then the government speech doctrine has lost all meaning. The government speech doctrine exists to let the government express its opinion, its message. Nothing in the fact that it can — They've done this through their regulation that the medical board is putting into place. Your Honor, it is true that the medical or the state of California legislature has a view that implicit bias ought to be taught. But that doesn't make CME courses government speech. It would be similar to NIFLA. NIFLA is the legislature says to all pregnancy centers, you have to slap on your wall — I'm sorry, you're talking about something else. I asked you a different question. Can you answer my question, though? Could you repeat your question, Your Honor? I'm sorry.  So the legislature made this particular regulation, made this particular requirement. They've delegated that to the medical board, state medical board. Why isn't it the case that that is the regulation that the government has laid upon this medical profession and, in fact, a requirement and, in fact, government speech? The regulation itself, maybe the text of the statute certainly could be classified as government speech. I don't know if it's speech, but I would be willing to allow for that to be speech. What is not speech is the CMEs that Dr. Katibi gives. And now what you have is you have something that arguably is government speech, the implicit bias mandate, being injected into what is private speech. Now you have a quintessential prima facie case of compelled speech. You have a government speech injected into private speech. That's what compelled speech is. That is what the doctrine is. And let me just explain. I do see I'm running into my rebuttal time. I will reserve the remainder of my time. Thank you. All right. Good morning, Your Honors. May it please the Court, Kristen Liska on behalf of the defendants in this matter. I think I'd like to start with plaintiffs in this case are clearly trying to frame what's happening here as the government giving a stamp of approval on private speech, trying to bring this within the scope of Mittal. But I think that it's important to take a step back and look at this entire regulatory scheme. And first and foremost, it's important to remember that CME courses exist for the purpose of fulfilling a CME requirement. We're not talking about any training, any class out there. We're talking about specifically courses doctors take to fulfill a regulatory requirement. Well, he's saying, hey, she's never been audited. She can teach and she's not going to teach this particular thing. Why isn't that just purely private speech? So I think you see, you know, if you're applying the factors from Shurtleff, I do think that the level of control the government has to exercise, and it's the existence, not so much the exercise itself of control that's relevant. You both see this on the front end and throughout the process. You know, the law specifies that CME courses must be educational activities that serve to maintain, develop, or increase the knowledge, skills, and professional performance of doctors. I mean, I think counsel's conceded. We talked about the provision 2190.1 or 2, now I forget which. It does set forth certain requirements. And as I hear his argument, he's saying that's not enough to turn private speech into government speech because it's just these, I guess, guidelines. And within those guidelines, she can say whatever she wants. So I think that's the front end. And then on the back end, you do still have the fact that the board retains authority to audit these classes. That comes through in two ways. There is in the regulations annual audits that occur, random audits. But the board, of course, can go and audit any course in response to concerns or investigations at any time. And if the board determines that the course does not meet the requirements for credit, the board can take away the credit. And I think that that is exactly the kind of control, the existence of control, the government authority that you see, especially in like the controlled subsidy cases, that are sufficient to establish government speech here. I think that what's going on here is really a situation where the government, you know, no one disputes that if the government, the board itself, taught these CME classes, that's government speech. No one disputes that if the board directly hired private instructors, that would be government speech. I don't think plaintiffs would dispute. This is essentially like in the controlled subsidy cases, where the government has gone to private entities and said, this is the message we want delivered, deliver our message for us if you want. So plaintiffs are making the choice to teach these classes for credit. They exist for purposes of this regulatory requirement. At the end of the course, some kind of certification form that the attending student doctors fill out? I am not sure on the nuances of that, Your Honor. I believe that there are required to be evaluations as part of the course, but I'm not sure if there's some sort of certification. I assume they have to submit their requirements the way lawyers have to certify that they've completed their CLE requirements as well. What if at the end of the course, last minute of the course, Dr. Katibi says, well, I am required to talk about this particular subject, which I think is phony and ridiculous and crazy, but here you go. I'm going to say these 30 seconds about this particular topic. Would that be okay? And would that be government speech? I'm not sure if the 30 seconds is sufficient to meet the statutory requirement to cover all the elements. I'll caveat my response with that aspect. It seems that the board is allowing a professional like the plaintiff to say that they disagree with the implicit bias. They don't think that it needs to be taught, but they're teaching it anyway. We would say that that just reinforces that the implicit bias requirement is government speech. First, the board is allowing this to happen. The board could say, actually, no, if you do this, it does not meet the requirement and your courses will not receive credit. The board can shut that down, which reinforces the control that exists over the message, which reinforces that it's government speech. And second, the fact that she can distinguish it also reinforces the way in which it's government speech. She can make clear that she's not the one saying anything about implicit bias. She's including it because she has to. The government is saying that this is information that doctors need to know in order to perform their job competently. And plaintiff can express her disagreement, maybe in the CME courses, but at the very least, in whatever other venue she wishes, including teaching classes that are not available for CME. Let me clarify what you're saying. Can she express her own personal disagreement with implicit bias, cultural competency, or whatever else within the CME accredited venue? So I'm going to say generally, yes. I think that there is a question as to how far she could go. At some point, she may say things that undermine the point of including the requirement, in which case the board may say that's too far. But at the very least, she can probably say, at least the board is allowing this for now. Of course, they can shut this down if they change their mind. But she can at least say, you know, I don't agree with this, but I have to teach it, and here's the content I have to teach. And I do want to speak to this question about, you know, does that make it private or public? And I think, look, we can drill down into each specific line set. Is this government? Is this public? Is this private? This is about the requirement to teach implicit bias. And that requirement is self-government speech, that it has to be included, what is said about it. You know, the regulation specifies how it should be taught that implicit bias needs to include one or both of two different things, examples or strategies generally. I don't feel like I need to read all the language. You have the statutes in front of you. So I think at the very least that part is government speech, the inclusion requirement, you know, even if we don't want to quibble over specific lines here or there. When I asked your friend on the other side to talk about the history of the expression itself, he said, well, we have to look at the expression. We don't look at the history of regulating the medical licensure. How should we be looking at that? So I believe that the language from the cases is that you look at the historical context of the expression. I think that the general overall context of the fact that we're dealing with a very regulated field that has long been regulated by the government is helpful and informative. I think it's also salient that, again, you know, CME courses exist because the law requires doctors to take CME courses. So if we're looking just at CME courses, that history itself, they've always existed because the government says we think doctors need to take further information. They need to know certain subjects, such as requirements to take specific classes, like classes on geriatric care for doctors who treat a lot of geriatric patients, classes on, you know, opioid pain on pain management or treating terminally ill patients. The state has from the beginning said you need to take certain types of courses for the purposes of being a good doctor, and we think you need to know this information. So even if you just look at the historical context of the expression of CME classes distinct from the overall field, we think that the overall history shapes the understanding of this and should be considered as well. That history reinforces that CME courses are government speech. If the court has no further questions, I'm happy to yield the rest of my time. Actually, you've got the extra time, so I'm interested to hear your argument on that second consideration of Shurtleff, whether there's a perception. Oh, yes, the perception. Coming from the state. Yes, I mean, I think that if you look to a doctor, doctors understand when they take CME courses that they're taking a course to get their credit for CME. That's why they're there. So they would understand that the course complies with the requirements by the government and includes the material that needs to be included, and they would understand that the aspects shaped by the government are government speech. I don't know if they would automatically understand, despite maybe being years in practice attending CMEs regularly, that they would perceive that the content is really controlled by the state or dictated by the state, which is why I'm asking if there's some sort of certification. There are evaluations. I just don't know if the evaluations have to do with the usefulness of the material. Because when they show up, it's all taught by other doctors, private individuals, and you wouldn't necessarily assume that the government has any control over that content. They would certainly know that the course they've walked into is for CME credit, that it's available for credit, and that they will obtain credit for it. So they would have that context and understanding of this is an event for which I can obtain CME credit, ergo it meets the requirements. I think, you know, even though if we kind of step back here, Shurtleff is very clear that this is a holistic test. This isn't, you know, factor by factor, case by case. You know, we think that doctors understand that what is taught in these courses complies with what the state requires, and to some extent, even things, for instance, you know, look, under plaintiff's theory, doctors can say whatever they want. But obviously, if a doctor were to say something like, any time a patient has eye pain, you just take out the eyeball. Of course, the board can shut that down, and doctors understand that no one's going to walk into a class and have an instructor just teach them such blatantly problematic things like take out eyeballs any time it hurts, or lobotomize all mental health patients, or, you know, even something maybe closer to what's going on here, like people of color lie about how much pain they're in, don't trust them. If someone said one of those things, of course the board would shut that course down, audit it, get rid of it, no credit for those courses, and the board needs to be able to control that. So I do think there's this background understanding that they're not going to be taught things outside the standard of care. They're not going to be taught things that are deeply problematic because these are being regulated for credit. But I do want to step back again and say this is a holistic inquiry, not driven by road application of rigid facts. That's the language from Shurtleff. And so even if this factor might be ambivalent, kind of cut both ways, I do think the first and third factors are so strong here, that support of finding a government speech, even if the second factor might lead in plaintiff's way, which of course we disagree with. If there are no other questions, I think I've said all I wanted to say. Thank you. We would request that the court affirm the decision below. Thank you, Your Honors. A few responses to my friend's argument. I heard her say that generally, yes, she could go up there and say, I don't buy implicit bias. This is bunk and still credit it. Now, if we're still in the realm of thinking that's government speech, I don't know what the government speech doctrine means anymore. My understanding of the government speech doctrine is that it is the government speaking. And if the state of California thought that this message was something that all doctors... Well, that's a clear case, right? If you've got an official standing out there speaking, okay, I don't think we'd be here debating it. Then the question is when the government is speaking through private individuals, you've got to have a way of assessing whether that falls within the government speech realm or whether that's still private speech. And that's why we're talking about the level of the state's control over what has to be taught in these classes. And I asked you this question, but I want to make sure that I understand your answer, because there is a statutory scheme here that does dictate quite extensively various standards or requirements that Dr. Kabiti has to teach in order for the class to be accredited. And what is your answer to that question of control? Are you saying that all of those issues are compelled speech, that she is being forced to carry those messages, but you're not challenging it? Or are you saying that that's not sufficient to constitute any sort of government control because they're too broad? Thank you for the question, Your Honor. Much like there is building codes that doesn't render the architecture plans government speech. They have to work within the realm of the building codes in order to create architecture. You have to work within the parameters of the medical board when you're creating your own CME. So I do not think that it is government speech. So the parameters, though, do go to content, but you're saying it's not enough. The parameters set some boundaries upon which content can be spoken. Yes, but what I'm saying is that it doesn't exert control over the message of the CME. It sets the boundaries on which the CME can occur, much like other regulation. Regulations commonplace and CLEs are quite common, and we are familiar with them in law. But the speakers that are delivering CLEs are not delivering government messages. They're delivering their own messages that they want lawyers to know. Just because they're forecourt. Delivering their own messages related to specific content or topics set forth by the government, right? Of course, of course. The government wants certain... But that's not enough because the regulations don't set the content out with greater specificity? Precisely. In order for there to be control over the message, the government has to control the message. What the government's speech factors are going to prove, they're going to prove whether or not this is the government speaking. And because the government sets parameters on something, it doesn't make it the government's speech. It just says that this is where we want the speech to occur. It's setting a forum, if you want to use that as an analogy. Counsel, if they wanted to teach these courses, as they've indicated, they just hire a bunch of people, here's a course, follow these different things. But what you're saying is that that's what they would have to do in order for it to be government speech. Outside of that, there's no government speech. Is that your position? Well, I would agree that if the government hired individuals to give CMEs, that that would be government speech. That would be the government speaking, government employees. That is quintessential government speech. What's your best case on that point? On the point that if the government were speaking itself, it would be government speech? On the point that you're saying that if it's something outside of the example that we just talked about, everything else is private speech. I'm not saying it's categorically so. In fact, we know for a fact that private speakers can be co-opted to deliver a government message. But the question is always going to be, is it the government's message? And a CME on appendicitis is not anything the state of California cares about. It cares about that you stay within the parameters of the regulation. So what the factors are going towards, and I see my time is up, what the factors are going towards is to determine whether the government is speaking. And no instance that we've talked about today is the government speaking. Would it be any different? I know that you're over time, but that's fine because I still have a question. Would it be any different if the government were more specific in the content that it requires Dr. Kibiti to speak? So, for example, in order to receive credit, I want you to teach about cultural competency, implicit bias, opioid addiction. And here are the resources from which you must teach and cover at least these five points in each of those areas. Otherwise, there's no credit. Would that make a difference in your analysis? Your Honor, I think that would make it – I don't think it would make a difference, and let me explain why briefly. In NIFLA, the most recent Supreme Court case dealing with compelled speech, you had private pregnancy centers heavily regulated by the state, much like doctors are heavily regulated by the state. The state of California put the precise words that they had to post on the wall verbatim. And the Supreme Court said, despite the heavily regulated nature, despite us telling you what you have to say verbatim, that is compelled speech because you are a private actor and we are requiring you as a private actor to deliver the government's message. That is what the government is doing here. They are co-opting private actors to deliver a government message. Whether it's compelled speech – those questions were on 12b-6 here. Only if you get credit. Only if you want credit, right? Otherwise, you can say whatever you want in whatever setting you want to. Right. In this particular case for CMEs. That's right, Your Honor, but that doesn't make it government speech. It may make it not compelled. It may make it not compelled speech. And we can litigate that, and maybe we'll be back up here before you, and you can tell me why it's not compelled speech in a year or two. But it doesn't make it government speech simply because the government comes over after the fact and puts a credit stamp on it. That is tam verbatim. All right. Any additional questions for Mendoza? Thank you very much to both sides for your helpful arguments today. The matter is submitted.
judges: TASHIMA, NGUYEN, MENDOZA